BRIGHT et al. v. BOWNE.

No. 30203. Feb. 10, 1942.

*122 P. 2d 147.*

A. N. Boatman, of Okmulgee, for plaintiffs in error.

Carland Smith, of Okmulgee, for defendant in error.

RILEY, J. This action was commenced by defendant in error, herein referred to as plaintiff, against plaintiffs in error, herein referred to as defendants, to recover damages for alleged wrongful acts of defendants in connection with drilling an oil and gas well, under a contract between defendants, owners of the land, and plaintiff. Plaintiff also sought a judgment in accounting for operations under the contract.

Defendants denied generally and counterclaimed for damages for alleged breach of the contract by plaintiff.

After issues were joined, the cause was set for trial on the jury docket. Plaintiff moved to strike the cause from the jury assignment and set the case for trial on the equity or nonjury assignment. This motion was denied. Thereupon, plaintiff filed a partial dismissal, dismissing that portion of his petition

under which he sought judgment for damages.

Plaintiff then renewed his motion to strike the cause from the jury docket. The motion was sustained; defendants at the time announced that they were not waiving a jury trial.

The cause was then tried to the court without a jury, resulting in a finding and judgment for plaintiff in the sum of $650.05, and an order allowing the attorney for plaintiff and the attorney for defendants each an attorney's fee of $100, and a further order declaring the judgment a lien on defendants' interest in the well, casing, equipment, etc., and taxing the attorneys' fees allowed both attorneys as costs in the case, and defendants appeal.

It is first contended that the court erred in denying defendants a jury trial. The record does not show that defendants objected to the orders of the court or saved any exceptions, other than the statement that they were not waiving a jury trial.

But since the proceedings, after the dismissal by plaintiff of his claim for alleged damages, were in principle for accounting or settlement of accounts growing out of the venture under the contract, which is hereinafter discussed, we hold that the court did not err in treating the action as one in equity, triable to the court without a jury. Defendants in effect concede the point in urging their second proposition, that, "The judgment of the court is against the clear weight of the evidence and is contrary to law."

On July 3, 1939, defendants were the owners in fee of a 40-acre tract of land in Okmulgee county, particularly described in the contract here involved.

Long prior thereto an oil and gas well, known as well No. 3, had been drilled on said land which was then producing from what is known as the upper Dutcher sand a small amount of oil, about two barrels per day, and was producing some gas sufficient to furnish gas for the home of defendants. On that date defendants, as parties of the first part, and plaintiff, as party of the second part, entered into a written contract whereby plaintiff Bowne agreed:

". . . at his own expense and cost to drill and deepen the present hole in said No. 3 well to what is generally known in said district as the Wilcox oil bearing sand, it being an additional depth of approximately six hundred fifty (650) feet, all for the purpose of producing oil and gas and other oil and gas or hydrocarbon products in commercial quantities and for the purpose of marketing said products.

"It is, nevertheless, understood and agreed that if oil or gas or other products of oil or gass (sic) are found and can be produced in commercial quanties (sic) at any lesser depth than the Wilcox sand, then the said Fred O. Bowne shall be under no obligation to drill any further depth, it being the intent hereof to increase the present production of said well in commercial quanties (sic) at a minimum depth and expense."

The contract further provided:

"Out of production, the parties of the first part are to receive fifty per cent of the gross and the said party of the second part is to receive fifty per cent of gross; each of the parties, however, are to stand and bear one-half of maintaining the well after the same is placed on production and each of the parties are to stand and bear one-half of the cost of marketing said production."

Other provisions will be noted later.

Thereafter plaintiff went upon said premises and, under a contract with Dodge Brothers Drilling Company, drilled said well about 50 feet deeper, at which depth gas in considerable quantities was discovered in what was described as a "stray sand."

It was, as found by the trial court, mutually agreed to save said well at that depth as a producer and to produce and market the production therefrom. In order so to do, plaintiff ordered and placed in said well a string of 5-inch casing, a packer, and other equipment. When this was done, gas was brought to the surface with some oil. In order to

market the production it was apparently necessary to install a separator, designed to separate the oil and gas. The well produced gas which was marketed for a short time. The pressure went down rapidly and the question of further drilling came up. In the meantime, controversy arose between the parties as to whether defendants were liable to pay one-half of the expense of installing the 5-inch casing, the separator, and other equipment. Thereupon, said parties entered into a supplemental agreement providing:

"This agreement, entered into this 2nd day of December, 1939, by and between Samuel Bright and Clara B. Bright, parties of the first part, and Fred O. Bowne, as party of the second part.

"Whereas, the parties hereto are at this time in dispute as to claims between the parties regarding work and material on well No. 3 on the Northeast Quarter (NE¼) of Southeast Quarter (SE¼) of Section Thirty-one (31), Township Fifteen (15) North, Range Twelve (12) East, Okmulgee County, Oklahoma, and the parties desire that the well be equipped and completed so as to attempt to utilize the gas and sell the gas to The Gas Service Company and to that end the party of the second part is expressly permitted to promptly undertake the work in connection therewith. It being understood that the second party is given authority to carry on said work.

"It is distinctly understood and agreed that this agreement shall not in any manner affect the respective claims of the parties hereto in connection with any work or material performed or placed upon the said lease, and that the respective rights of the parties in connection therewith shall be in full force and effect to the same extent as if this agreement had not been executed, and this agreement shall never be construed as changing the original contract between the parties with reference to said well, and the said original contract shall remain in full force and effect."

Plaintiff proceeded with the same driller, Dodge Bros. Drilling Company, and drilled the well another 50 feet. Production was not increased and the project was abandoned.

Another provision of the original contract is:

"It is further agreed that in the event gas or oil are found by said Fred O. Bowne in well No. 3 through additional drilling in commercial quantities and the said Bowne operates said well then the said Fred O. Bowne, in addition to all other obligations he hereby assumes, shall pay to the said parties of the first part a sum of money equal to one-half the value of salvage market prices of the present tubing, casing, rods, pump and engine, in their present condition, in said well No. 3 and whereby the same is at the present time being operated."

Plaintiff made no attempt to replace the well to its former condition. Defendants' counterclaim is based in part on such failure. Defendants claim $124.98, the actual expense in restoring the well, and $264 for loss of production from December 15, 1939, the date of abandonment by plaintiff, to April 15, 1940.

The principal question presented is the meaning of the words in the original contract:

". . . each of the parties, however, are to stand and bear one-half of maintaining the well after the same is placed on production and each of the parties are to stand and bear one-half of the cost of marketing said production."

Plaintiff contends that the meaning is that when he had drilled an additional depth to the top of the sand which was then thought and decided would produce sufficient gas to make a commercial well, or produce in paying quantities, that he had done all that the agreement required him to do at his own expense, and that the well was then placed on production, so as to require defendants to bear one-half of the expenses in cleaning out, buying and setting casing, and other expense thereafter incurred in getting ready to market and in marketing the production. Defendants contend that the words "after the same (well) is placed on production" mean after gas is brought to the surface ready to turn into a pipe line, or oil is brought to the surface ready to

be turned into a tank, or pipe line, and that they were not liable to pay any part of the expense of cleaning out, buying casing, setting casing, or buying and installing the separator.

The trial court apparently took the view that the contract was ambiguous in this respect and permitted both parties to present experienced or so-called "expert" witnesses to interpret or construe the meaning of the language employed in the light of custom, usage, etc., in the oil producing business. About the same number of witnesses, with substantially the same experience and qualifications, testified for each party. So far as the so-called "expert" testimony is concerned, the evidence on each side of this question is about evenly balanced.

The trial court apparently held with plaintiff's contention. The court found:

"The court finds that on the 20th day of July, 1939, the well involved in this suit was producing gas in paying quantities, and that on said last mentioned date the plaintiff and the defendants herein mutually agreed to save the said well as a producer and to produce and market the production from said well; and that accordingly from and after the time the parties mutually decided to save the said well as a producer, the plaintiff and defendants were equally liable for all necessary expense thereafter incurred in connection with the said well."

The uncontradicted evidence is that the first gas showing was on July 19th. It was apparently July 20th when it was agreed to try to save the well as a gas well. That was before casing was placed in the well. The court then specifically finds:

"That after the parties mutually decided to save the well as a gas well, the plaintiff placed necessary casing, equipment, material and supplies in and about said well at an actual cost unto the plaintiff of $1,654.07 and that after the parties mutually agreed to save the said well as a producer, the plaintiff paid and obligated himself to pay unto Walter Dodge for necessary work in and about said well, the sum of $748.68. . . ."

A large part of the amount allowed plaintiff was for money expended in buying casing, cleaning out, setting casing, etc., before any gas was or could be produced and saved.

Defendants contend that there is no ambiguity in the contract in this respect, and that "placed on production" means what it says; that is, that the well must have been producing oil or gas before they became liable to pay for any part of the expenses; that they were liable only for one-half the expense of maintaining the well and marketing the production from and after the time oil or gas was actually produced from the well. With this contention we are inclined to agree.

The construction placed upon the contract by plaintiff and his witnesses, and adopted by the trial court, would lead to an absurdity. For instance, a number of plaintiff's witnesses testified that they had read the contract, and that under said contract the well was "placed on production" when it was drilled to the sand found to be a producing well. Some of them testified that in their opinion the well was "placed on production" when it was drilled to the top of the gas producing sand. Such could not be the meaning of the contract. Such construction would lead to an absurdity.

Let us suppose that an oil and gas lease providing for payment of the usual royalties should be executed, and then provided that the lessee should go into possession and prospect for oil and gas, and that the lease would continue a given number of years, say five years after a well was "placed on production." It could not be said that the lessee, under such a lease, could drill to the top of a producing sand, however prolific, and there stop and do nothing more and hold the land for five years thereafter. That would be an absurd contention, considering the fact that the primary purpose in the execution of an oil and gas lease is to explore for and bring to the surface oil or gas, if any be found, and market the product to the benefit of both lessor and lessee. That was the

purpose of the contract here involved as specifically stated therein. It says:

". . . all for the purpose of producing oil and gas and other oil and gas hydrocarbon products in commercial quanties *(sic)* and for the purpose of marketing said products."

Common sense dictates that, in speaking of an oil or gas well, it is on production when it is actually producing oil or gas. When a well is merely drilled to the top of a sand or other formation containing oil or gas, it cannot be said to be "on production." A well is not on production until it is producing something capable of being marketed. Cole Petroleum Co. v. U. S. Gas & Oil Co., 121 Tex. 59, 41 S. W. 2d 414. The meaning of the contract in this respect is clear.

Plaintiff lays much stress upon the fact that the contract nowhere specifically provides that plaintiff shall bear the expenses of equipping the well. It is true that the contract does not specifically provide that plaintiff should bear all the expense of equipping the well. Neither does it specifically provide that defendants should bear any part of such expense. It does provide that plaintiff shall, at his own expense and cost, drill and deepen the well for the purpose of producing oil and gas or other hydrocarbon products in commercial quantities and for the purpose of marketing same. It then specifies the time or stage of the operation at which each party thereafter pay one-half of the expense. If there be any ambiguity or doubt as to how the expenses incurred between the time the well was actually drilled to the producing sand or other formation and the time oil or gas was actually produced, the doubt must be resolved in favor of defendants, for the reason that the contract was formulated and drawn by plaintiff and his attorney, as shown by the uncontradicted evidence. Defendants are not liable for any part of the expenses incurred in cleaning out, buying the casing, and necessary valves, etc., setting the casing, etc.

The purchase and installation of the separator and the foot gate valve, the latter being purchased November 25, 1939, are items properly chargeable to maintenance of the well and marketing the products thereof. All or nearly all of defendants' witnesses testified, in substance, that the separator was an item necessary for preparing the production for marketing after it had been brought to the surface. Reason supports this interpretation of the contract.

The separator, as stipulated, cost $408, and the foot gate valve cost $6.58, without sales tax. Expense of installing the separator was $26.64; total $438. Defendants are clearly liable for one-half the cost thereof, or $219.

The contract provided that upon abandonment of the project, plaintiff was to restore the well to its former condition. This he did not do. The uncontradicted evidence and finding of the court are that this cost defendants $124.98. Defendants should be allowed a set-off of same amount against the $219. This would reduce defendants' liability to $94.02 without regard to plaintiff's liability to pay defendants one-half the salvage value of the tubing, casing rods, pump, and engine in and about the well at the time plaintiff took possession. Plaintiff admits his liability therefor and the court found its value thereof to be $1,104; one-half thereof would be $552, for which plaintiff would have been liable to defendants. But he would also then have been the owner of a one-half interest therein. But in restoring the well defendants retain these items, and, of course, must account to plaintiff therefor if he is to be charged with one-half their value. Finally, these matters offset each other. This would leave defendants liable to plaintiff in the sum of $94.02 with plaintiff the owner of the string of 5-inch casing placed in the well, and the packer placed in the well, and a one-half interest in the separator and foot gate valve, except for the fact that Dodge Brothers Drilling Company has obtained a judgment in another action

against plaintiff and defendants jointly for and on account of the cost of said "deepening operations," substantially all of which or approximately $421.68 should be paid by plaintiff. That judgment has apparently been made a lien on defendants' land, the well, and all the equipment. Before plaintiff is entitled to a lien on any part of defendants' interest in said separator or other equipment, he must pay said judgment and discharge the lien on defendants' property, to the extent of $421.68, costs and attorney's fees. Unless and until he does so, plaintiff is not entitled to a lien on any part of defendants' property, and incidentally is not entitled to the attorney's fee of $100 allowed by the court.

The finding and judgment are against the clear weight of the evidence.

Judgment reversed and the cause remanded for further proceedings.

WELCH, C. J., CORN, V. C. J., and OSBORN, BAYLESS, GIBSON, HURST, DAVISON, and ARNOLD, JJ., concur.